UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EDWARD HSIEH, <br><br>　　　　Plaintiff, <br><br>v. <br><br>ASIAN AMERICAN CIVIC ASSOCIATION, INC.; MARY CHIN; and RICHARD SOO HOO, <br><br>　　　　Defendants. | No. 1:22-cv-10476-JEK |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**KOBICK, J.**

　　Plaintiff Edward Hsieh claims that the defendants—his former employer, Asian American Civic Association, Inc. ("AACA"); AACA Chief Executive Officer Mary Chin; and AACA Board Member Richard Soo Hoo—retaliated against him, in violation of Title VII and M.G.L. c. 151B, when they suspended him in August 2021 and then terminated his employment in October 2021. Pending before the Court is the defendants' motion for summary judgment. That motion will be denied. The undisputed evidence demonstrates that Hsieh alerted AACA management to incidents of possible racial discrimination and sexual harassment in the workplace, and that he was thereafter placed on leave and eventually terminated. Although the defendants proffer ample evidence that they suspended and terminated Hsieh for legitimate and non-retaliatory reasons, Hsieh also offers evidence causally linking his suspension and termination to his complaints of discrimination and harassment. The evidence identified by Hsieh gives rise to a genuine dispute of material fact as to

whether the defendants' proffered reasons for his termination were pretextual. The defendants are not, accordingly, entitled to summary judgment.

## BACKGROUND

**I.    Factual Background.**

The following facts, unless otherwise noted, are either undisputed[1] or recounted in the light most favorable to Hsieh, as the non-moving party. *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

AACA is an agency that provides social services to immigrants. ECF 47, ¶ 1. Hsieh worked at AACA from 2019 until his termination in October 2021. *Id.* ¶¶ 3, 92. AACA hired Hsieh in 2019 to serve as Director of Business Growth and then, in 2020, promoted him to Chief Operating Officer. *Id.* ¶¶ 3-4. In that latter role, Hsieh was responsible for overseeing all departments at AACA and was "second in command." *Id.* ¶ 5. At all relevant times, Chin was the Chief Executive Officer of AACA. *Id.* ¶ 2.

   A.    Hsieh's Complaints of Potential Discrimination and Harassment at AACA.

Hsieh avers that "for several years," including in the months before his suspension in August 2021, he informed three individuals at AACA—Chief Executive Officer Chin; Suzanne Case, the Vice President of the AACA Board of Directors; and Dr. Deeb Salem, the Chairman of the AACA Board of Directors—of "sexually harassing remarks and actions" and "inappropriate

---

[1] In responding to the defendants' statement of undisputed material facts, Hsieh repeatedly purports to dispute the proffered facts. Often, however, Hsieh fails to cite record evidence that contradicts the defendants' proffered facts, Fed. R. Civ. P. 56(c)(1)(A), and fails to make any showing that the evidence cited by the defendants is genuinely disputed or inadmissible, Fed. R. Civ. P. 56(c)(1)(B). Thus, where supported by admissible evidence and not adequately disputed by Hsieh with reference to the record, the Court accepts the facts set forth in the defendants' statement of undisputed material facts. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

2

racial remarks" by staff at AACA. ECF 47-2, ¶ 2. Hsieh believed that the conduct he reported violated laws protecting against discrimination and harassment in the workplace. *Id.*

Specifically, Hsieh reported to Chin, "on a regular basis in managerial meetings," that AACA staffers had made racially discriminatory comments and engaged in harassing conduct. ECF 46-3, at 67:17; *see* ECF 47, ¶¶ 73-74. Hsieh told Chin that staffers had used the term "Chinese fire drill"; made "jokes about [Asians] using fairly stereotypical, off-color terms"; and employed "fake immigrant accent[s]." ECF 46-3, at 67:16-72:19; *see* ECF 47, ¶¶ 73-74. Chin recalled Hsieh informing her that a staffer had told another staffer that she looked "like a geisha" or that she was "wearing the makeup of a geisha." ECF 46-2, at 28:20-29:8; *see* ECF 47, ¶ 74. She also recalled Hsieh informing her that the same staffer had offered to "give [an employee] a neck rub" and had "grabbed [an administrative assistant's] hand" when she returned from vacation and "kissed the hand" so as to say, "welcome back." ECF 46-2, at 29:14-31:10; *see* ECF 47, ¶ 74.

Hsieh also alerted Case to incidents in which that AACA staffer "made inappropriate remarks" about a young female employee and "sa[id] something to a woman about her looking like a Geisha girl." ECF 47-6, at 11:12, 17:2-3; *see* ECF 47, ¶ 70. Hsieh complained to Case that Chin "favored men in the organization." ECF 47-6, at 17:10; *see* ECF 47, ¶ 70. Case testified that "[e]very time [she] had [a] conversation or e-mail with [Hsieh,] [she] shared that information with [Dr. Salem]" and "spoke to Human Resources" about Hsieh's complaints. ECF 47-6, at 15:14-19:7. At some point, Hsieh also emailed Dr. Salem to raise "questions about [the] handling of harassment" at AACA. ECF 46-12, at 30:13-31:19.

B.   Hsieh's Relationship with Chin.

From the outset of his employment at AACA, Hsieh disagreed with Chin's approach to leadership as Chief Executive Officer. ECF 47, ¶ 12. Hsieh testified that his "issues with [Chin],

3

her leadership style, were apparent fairly quickly," and that he "was trying to have a working relationship with her," but that "her issues . . . definitely ramped up over time." ECF 46-3, at 25:5-9; *see* ECF 47, ¶ 13. Chin testified that she believed Hsieh had "issues working with [her]" and "recognizing [her] as his boss." ECF 46-2, at 18:1-3; *see* ECF 47, ¶ 11.

Hsieh made several remarks to Chin, and to other AACA colleagues regarding Chin, that reflected their strained working relationship. Chin testified that Hsieh would say things to her such as, "stay out of my way," and "leave me alone." ECF 46-2, at 18:1-19; *see* ECF 47, ¶¶ 10-11. On October 18, 2020, after Chin suggested that Hsieh participate at a voluntary AACA event for children, Hsieh emailed Chin: "Last week at AACA was a very disappointing week to me for many reasons and due to many different people's behavior. To be blunt, while you were only one of the culprits, I had warned you before not to interfere with my martial arts. Your repeated insistence that I teach children despite me repeatedly saying no was disrespectful, demonstrated again a lack of understanding of what I do, and filled me with quiet rage." ECF 46-5; *see* ECF 47, ¶¶ 19-20. When asked at his deposition what he meant by the comment "filled me with quiet rage," Hsieh testified that he "was angry at [Chin] for continuing to talk about [his] martial arts [while] at the same time . . . trying to ask [him] to do things voluntarily for the organization." ECF 46-3, at 31:14-19.

On April 12, 2021, in response to a suggestion by Chin that AACA offer a self-defense workshop to senior citizens, Hsieh emailed Chin, "you've officially pissed me off," and told a colleague that Chin was "a bad spoiled brat . . . even more so since her stroke." ECF 47, ¶¶ 21-22. Two days later, in response to a suggestion that Chin made regarding an upcoming fundraising gala, Hsieh told another colleague that Chin was a "spoiled brat" and a "sleazy guy at the bar that doesn't read the room." *Id.* ¶ 23. On May 7, 2021, Hsieh sent an email to Chin—and blind copied

4

three other colleagues—in which he called her suggestion for a self-defense workshop for senior citizens "a horrible idea." *Id.* ¶ 24. On June 11, 2021, after Chin made a suggestion about Hsieh's performance at an upcoming fundraising gala, Hsieh emailed Chin, "this is your final warning . . . just because I'm calm in your presence, doesn't mean I'm not furious about it." *Id.* ¶ 25. Hsieh ultimately filed a written complaint with Human Resources concerning Chin's "meddling" with his performance at the upcoming fundraising gala. *Id.* ¶ 26. Finally, on July 1, 2021, Hsieh emailed a colleague that his "gut ha[d] been drowned out by outright fury and frustration with [Chin]." *Id.* ¶ 28.

      C.      <u>Hsieh's Interactions with His Supervisee.</u>

Carey Lin, a female employee in her early twenties, reported directly to Hsieh. *Id.* ¶ 29. They communicated with each other via instant message, and on occasion, Hsieh used "sexual innuendos" in these communications and attempted to provide Lin with dating advice. *Id.* ¶¶ 30, 33. Hsieh testified that he "discuss[ed] dating" and "who [he] dated in the past" with Lin. ECF 46-3, at 141:10-142:14; *see* ECF 47, ¶ 31. Once, Hsieh told Lin over instant messenger that he "went on a date with [a woman], and she asked to bring her sister along," to which Lin replied, "what is with you and threesomes[?]" ECF 46-11, at 8-9; ECF 47, ¶ 31. He also told Lin he had "dated someone who told [him], partially through the relationship, that she was escorting on the side." ECF 46-3, at 150:19-21; *see* ECF 47, ¶ 32; ECF 46-11, at 10 (instant messenger record reflecting that while discussing dating, Hsieh wrote to Lin, "I didn't even tell you about the girl who ended up being a high class escort"). On another occasion, Hsieh told Lin that he had visited a hotel bar and that "all the girls there were all dressed like whorish." ECF 46-11, at 3-4; *see* ECF 47, ¶ 34. At his deposition, Hsieh clarified that he "was referring to the fact that everyone [at the bar] was wearing super-short skirts, basically showing everything, and you know, it was that sort

5

of environment." ECF 46-3, at 145:19-146:10; *see* ECF 47, ¶ 34. Hsieh testified that he believed such conversation topics were acceptable because he and Lin were friends. ECF 47, ¶ 35.

      D.      <u>Hsieh's Martial Arts Practice.</u>

Hsieh is a highly trained martial artist who kept a steel sword at AACA's office while he worked there. *Id.* ¶ 6. The parties dispute whether Hsieh had permission from AACA's Board of Directors to keep the sword at work. *See id.* ¶ 7. While the defendants contend Hsieh did not have the Board's permission, Hsieh testified that although he did not have "express authority from the Board to keep the sword in AACA's office," he had "asked [Chin] verbally," and "to [his] knowledge, most Board members were aware that it was there." ECF 46-3, at 96:3-98:16. In the evenings, Hsieh videotaped himself performing martial arts on top of a conference room table at AACA and posted at least one video to YouTube. ECF 46-3, at 98:14-99:1; *see* ECF 47, ¶ 8. Hsieh did not seek or obtain permission before filming that video. ECF 46-3, at 99:2-23; *see* ECF 47, ¶ 9.

      E.      <u>Events of August 9, 2021.</u>

On August 9, 2021, the Personnel Committee of the AACA Board of Directors resolved to suspend Hsieh with pay. ECF 46-13, at 1, 3; *see* ECF 47, ¶ 51. In the months leading up to that determination, the Board had been unimpressed with Hsieh's work and managerial style and was concerned that Hsieh lacked the leadership qualities necessary to assist in running AACA as Chief Operating Officer. ECF 47, ¶¶ 43-44. Dr. Salem testified that "less than a month" or "a couple of weeks" before the August 9 determination, the Board had discussed placing Hsieh on paid leave because it was "sort of unanimous" among Board members that "something had to be done with the way he was behaving towards [Chin]." ECF 46-12, at 13:13-14:14; *see* ECF 47, ¶ 45. Several Board members also "felt uncomfortable with [Hsieh's] swordsmanship" in the workplace and

thought that the video of Hsieh "wielding a sword" in AACA's offices "was truly embarrassing for an organization that believes in helping people." ECF 46-12, at 16:15-17:1; *see* ECF 47, ¶¶ 48-49.

The minutes for the August 9, 2021 Personnel Committee meeting reflect that the Board "agreed that [Hsieh] need[ed] to be suspended with pay pending further investigation," and that Chin would inform Hsieh accordingly. ECF 46-13, at 3; *see* ECF 47, ¶ 50. The committee also "agreed to have a police detail present [that] afternoon with [Chin] when she notifie[d] [Hsieh] of [his suspension]," because the "committee felt it would be best to take this precaution rather than have any serious harm com[e] to anyone in the office in the worst case scenario." ECF 46-13, at 3; *see* ECF 47, ¶ 51. Defendant Richard Soo Hoo was tasked with "reach[ing] out to [AACA's] Boston Police contact" and "requesting a police detail for [that] afternoon through the end of the week." ECF 46-13, at 3; *see* ECF 47, ¶ 53.

Consistent with the Board's instruction, Soo Hoo called 911 to request a police detail from the Boston Police Department. ECF 46-13, at 3; *see* ECF 47, ¶¶ 54-57. According to the Boston Police Offense/Incident Report and 911 call transcript, Soo Hoo identified himself as an AACA Board member and reported that an AACA employee had been "bringing a sword, a Samurai sword, into the workplace." ECF 47-5, at 2:10-11; ECF 47-4, at 1; *see* ECF 47, ¶ 57. Soo Hoo indicated that the Board was "going to have a person talk to him about not bringing the weapon into the building and also taking it away" and wanted to "request a police presence" because they thought "he might get upset at this news." ECF 47-5, at 2:12-18; ECF 47-4, at 1; *see* ECF 47, ¶ 57. When the 911 dispatcher asked Soo Hoo if Hsieh had threatened anyone with the sword, Soo Hoo replied that Hsieh had "made no threats, but he brandishes it around, and apparently, he uses the conference room table to practice his martial arts training in the building during work hours" and

"shows off his skills during business hours," leaving people "concerned." ECF 47-5, at 5:9-16; *see* ECF 47, ¶ 57. The 911 dispatcher asked if Hsieh had "any special needs or any mental health issues," and Soo Hoo replied that Hsieh has "an explosive temper." ECF 47-5, at 5:17-22; *see* ECF 47, ¶ 57. The dispatcher informed Soo Hoo that they would send an officer to AACA. ECF 47-5, at 5:24; *see* ECF 47, ¶ 57.

When the police arrived at AACA that day, Chin and Hsieh were together in a conference room for a meeting with other staffers. ECF 46-2, at 55:12-13; ECF 46-3, at 115:1-116:11. At some point during the meeting, a staffer came to the conference room and gestured for Chin to step out. ECF 46-2, at 55:12-16; ECF 46-3, at 115:13-21. The staffer then told Chin that police were in the building looking for her, and she instructed the staffer to invite the police upstairs so she could speak with them. ECF 46-2, at 55:16-22; *see* ECF 47, ¶ 58. The police officers told Chin that they were looking for the person with the sword. ECF 46-2, at 55:22-24; *see* ECF 47, ¶ 58. Understanding the police officers to be referring to Hsieh, Chin informed the officers that the man they were looking for was in the conference room. ECF 46-2, at 55:24-56:5; *see* ECF 47, ¶ 58.

Meanwhile, in the conference room, Hsieh received a text message from a friend informing him that she had received an alert from an emergency alert application reporting that police had been dispatched to AACA to respond to a "man waving a sword." ECF 46-3, at 115:22-116:7 (quotation marks omitted); *see* ECF 47, ¶ 58. Hsieh thereafter left the conference room and immediately encountered six police officers. ECF 46-3, at 116:12-17; *see* ECF 47, ¶ 58. Hsieh testified that the "lead officer was brandishing a shotgun," and that "[s]ome of the other officers had their hands on their sidearms." ECF 46-3, at 116:18-22; *see* ECF 47, ¶ 58. As Hsieh approached, one officer recognized him as a martial arts expert and told his fellow officers: "'I know him. He's a martial arts teacher. . . . He's not a threat. He's a good guy.'" ECF 46-3, at

8

117:6-13; *see* ECF 47, ¶ 61. The officers briefly questioned Hsieh about his sword, conducted a sweep to assess whether there was any danger at AACA, and then left after determining that all employees were unharmed and not in danger. ECF 46-3, at 117:14-118:16; ECF 47, ¶ 62. The police officers never touched, handcuffed, or arrested Hsieh. ECF 47, ¶ 63.

After the police left AACA, Chin and Hsieh went into a conference room and discussed the Board's decision to place Hsieh on administrative leave with pay. *See* ECF 46-2, at 59:5-13. Their meeting lasted for almost two hours, and, according to Hsieh, most of the conversation involved Chin "saying that [he] should not have described discrimination or harassment to AACA Board members." ECF 47-2, ¶ 5. Hsieh also testified that Chin "brought up [his] complaints about discrimination and harassment and said [he] should have never told the Board about those," and tried to convince him that his complaints about discrimination and harassment at AACA were unfounded. ECF 46-3, at 113:3-6, 120:2-5. Nevertheless, Chin "stated that she would work with the AACA Board to have [Hsieh] come back to work." ECF 47-2, ¶ 5.

F.    Hsieh's August 24, 2021 Meeting with Chin and Dr. Salem.

On August 20, 2021, while on paid administrative leave, Hsieh received a text message from Chin asking if he could meet with her and Dr. Salem four days later "'to explore with [Hsieh] the possibilities of returning to AACA.'" *Id.* ¶ 6. Hsieh agreed to meet with Dr. Salem and Chin on August 24. *Id.*; *see* ECF 47, ¶ 65. During the meeting, Chin told Hsieh, "we don't want you to leave but . . . you have to stop some of this behavior, you can't be talking . . . about [me] behind [my] back, you have to be a team member." ECF 46-12, at 27:12-18. Dr. Salem "stated that he hoped the meeting would have a good outcome for everyone" and "urged [Hsieh] to come back to work," but stressed that Hsieh "would have to acknowledge that [Chin] was [his] boss." ECF 47-2, ¶ 7.

According to Hsieh, at the meeting, Chin also "tried to get [Hsieh] to say that [he] never saw any discrimination and that [he] had never complained to her about that." *Id.* ¶ 6. And at one point, Chin and Dr. Salem "presented [Hsieh] with a document that detailed the terms [he] would have to agree to if [he] wanted to return to work." *Id.* ¶ 8. The document included a statement that Hsieh "was required to agree that [he] had not witnessed any sexual harassment or racial discrimination, that [he] had not reported any sexual harassment or racial discrimination, and that [he] was mistaken in any reports regarding [these] matters." *Id.* ¶ 10. Hsieh was "uncomfortable with the document," in part because, in his view, Chin and Dr. Salem "were conditioning [his] return to work on making these false statements." *Id.* ¶¶ 8, 10. Since Hsieh viewed the document as untrue, he "refused to sign it" and said he "needed to think over what had happened and what was in the document." *Id.* ¶ 10.

Hsieh reminded Dr. Salem that he "had reached out previously to him and to [Case] because of the human resources concerns [Hsieh] had," and that he had "reported harassment and discrimination issues to [Chin] but that she had failed to take any actio[n], so [he] had escalated the matter to the Board." *Id.* ¶ 11. Hsieh avers that Chin then became "very angry" and "started saying that she had done something about the matters that [he] had reported to her," that "one of the offenders no longer touched young women," and that she "talked to the offender and thought he had stopped his behavior." *Id.* According to Hsieh, Chin then said: "That's it? That's all you have to complain about me? That some guys are getting away with racism and sexism?" *Id.* Hsieh testified that Dr. Salem instructed him to "'[j]ust sign this document,'" and to "'[t]hink about [his] career.'" ECF 46-3, at 158:4-6.

Hsieh "stated that [he] was not going to resign but [he] was not sure what [he] would do next," and that he "felt [he] was being retaliated against." ECF 47-2, ¶ 12. In Hsieh's recollection,

10

the meeting ended with Chin and Dr. Salem saying that "they would contact [him] again for another meeting to discuss further." ECF 46-3, at 158:12-14. Dr. Salem, however, testified that Hsieh ended the meeting by saying that he could no longer work at AACA and "semi storm[ing] out of [Dr. Salem's] office." ECF 46-12, at 27:20-22; *see* ECF 47, ¶ 66.

      G.      <u>Hsieh's Termination.</u>

On August 27, 2021, Hsieh avers, "AACA was made aware of [his] claims that the August 9, 2021 incident constituted illegal retaliation against [Hsieh] in violation of the discrimination laws." ECF 47-2, ¶ 13. One month later, Hsieh's attorney "transmitted a detailed explanation of [his] claims of retaliation, as well as an executed charge of discrimination, to counsel for AACA." *Id.* ¶ 14. On October 8, 2021, Hsieh's counsel received AACA's response indicating that Hsieh's employment "would be terminated in 10 days." *Id.* Hsieh avers that neither he nor his attorney "heard anything further about [his] employment being terminated until November 22, 2021, when AACA informed [him] that [his] health and dental insurance benefits would be terminated." *Id.* The November 22, 2021 notice listed his termination date as October 18, 2021. *Id.*

**II.**    <u>**Procedural History.**</u>

Hsieh filed this action against AACA, Chin, and Soo Hoo in March 2022. ECF 1. His complaint asserts claims for retaliation, in violation of M.G.L. c. 151B, § 4(4), against AACA, Chin, and Soo Hoo (Counts I, III, IV), and a claim for retaliation, in violation of Title VII, 42 U.S.C. § 2000e-3(a), against AACA (Count II). *Id.* ¶¶ 39-46. Following a period of discovery, the defendants moved for summary judgment on all of Hsieh's claims against them. ECF 44.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

"'Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices.'" *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 114-15 (1st Cir. 2024) (quoting *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011)). The statute's anti-retaliation provision "protects two forms of conduct: (1) participating in a Title VII proceeding; and (2) 'oppos[ing] any practice made an unlawful employment practice by [Title VII].'" *Id.* (quoting 42 U.S.C. § 2000e-3(a)). The Massachusetts employment discrimination statute, M.G.L. c. 151B, similarly forbids "any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under [Chapter 151B] or because he

has filed a complaint, testified or assisted in any [Chapter 151B] proceeding." M.G.L. c. 151B, § 4(4). Under both Title VII and Chapter 151B, "[a] claim of retaliation may succeed even if the underlying claim of discrimination fails, provided that in asserting [a] discrimination claim, the claimant can 'prove that [he] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination.'" *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 706 (2011) (quoting *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 121 (2000)); *see Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009).

Absent direct evidence of retaliation, courts use the burden-shifting framework outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973), to assess retaliation claims under Title VII and Chapter 151B. *See López-Hernández v. Terumo Puerto Rico LLC*, 64 F.4th 22, 31 (1st Cir. 2023) (as to Title VII); *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 406 (2016) (as to M.G.L. c. 151B, § 4). "First, the plaintiff must establish a prima facie case by demonstrating that (1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity." *Kinzer*, 99 F.4th at 115; *Verdrager*, 474 Mass. at 406. "'Once the plaintiff makes out this prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions.'" *López-Hernández*, 64 F.4th at 32 (quoting *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015)). "If the defendant carries this burden of production, the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation." *Planadeball*, 793 F.3d at 175.

"To defeat summary judgment, the plaintiff need not prove retaliation by a preponderance of the evidence," but instead must only "'raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action.'" *Id.* (quoting *Collazo v. Bristol-Myers Squibb Mfg.,*

13

*Inc.*, 617 F.3d 39, 50 (1st Cir. 2010)). "Within that standard, however, a reasonable jury must be able to conclude that retaliatory animus was the but-for cause of the adverse action." *Kinzer*, 99 F.4th at 115 (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Thus, the plaintiff is required to offer "proof that the unlawful retaliation would not have occurred in the absence of" his protected activity. *Nassar*, 570 U.S. at 360; *see Carlson v. Univ. of New Eng.*, 899 F.3d 36, 44 (1st Cir. 2018). If "no reasonable factfinder could reach the conclusion that this but-for standard has been met," summary judgment is appropriate. *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014).[2]

### I.     Hsieh's *Prima Facie* Case.

At the first step of the burden-shifting analysis, Hsieh must establish a *prima facie* case of retaliation. The parties agree that the defendants' decisions to suspend and terminate Hsieh qualify as adverse employment actions, thus satisfying the second element of Hsieh's *prima facie* case. Accordingly, the analysis turns on the first and third elements—whether Hsieh's reporting of discrimination and harassment at AACA amounted to protected conduct and, if so, whether the decisions to suspend and terminate him were in response to that protected conduct. *See Kinzer*, 99 F.4th at 115.

#### A.     Protected Conduct.

The parties agree that Hsieh lodged complaints regarding the conduct of AACA employees with Chin, Case, and Dr. Salem, but they dispute whether the substance and sincerity of Hsieh's complaints rose to the level of protected conduct. The defendants contend that Hsieh's complaints

---

[2] Hsieh contends that the record contains direct evidence of retaliation, such that the Court may bypass the burden-shifting analysis and proceed to address whether the non-retaliatory explanations advanced by the defendants are pretextual. ECF 48, at 15-16; *see Kinzer*, 99 F.4th at 117 n.12. The Court need not decide this question, because the defendants are not entitled to summary judgment under the burden-shifting analysis.

did not involve statutorily prohibited discrimination or harassment, but instead pertained to Chin's leadership style, staffing concerns at AACA, and disputes between employees regarding political matters. Hsieh responds that his complaints were protected conduct because he reasonably believed he was reporting instances of sexual harassment and racial discrimination at AACA.

Drawing all inferences in Hsieh's favor, a reasonable jury could find that Hsieh held a "good faith, reasonable belief that the underlying challenged actions of [the defendants] violated the law." *Fantini*, 557 F.3d at 32 (citation and quotation marks omitted); *see Edwards v. Commonwealth*, 488 Mass. 555, 571-72 (2021). Title VII "protects an employee for . . . informally opposing an employment activity that *might* violate Title VII." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 108 (1st Cir. 2015) (emphasis added). Likewise, under Chapter 151B, a retaliation claim's "viability does not depend on the success of the underlying discrimination claim, so long as the plaintiff can prove that he 'reasonably and in good faith believed the [defendant] was engaged in wrongful discrimination.'" *Smith v. Winter Place LLC*, 447 Mass. 363, 364 n.4 (2006) (quoting *Abramian*, 432 Mass. at 121). "[W]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity, and that act is protected so long as the conduct would qualify in the minds of reasonable jurors as resistant or antagonistic to the [unlawful employment practice]." *Kinzer*, 99 F.4th at 115-16 (quotation marks and underlining omitted).

The record here demonstrates that Hsieh made repeated complaints to his supervisor and AACA Board members about conduct by AACA staffers that could have implicated the provisions of Title VII and Chapter 151B barring race and sex discrimination in the workplace. He reported to Chin "on a regular basis in managerial meetings" that staffers had made "discriminatory

15

comments"—among other things, using the term "'Chinese fire drill,'" making "jokes about [Asians] using fairly stereotypical, off-color terms," and employing a "fake immigrant accent." ECF 47, ¶¶ 73-74. He reported an incident to Chin and Case in which an AACA staffer referred to another staffer as a "'geisha girl,'" and reported to Chin that a staffer offered to give another staffer a neck rub, and separately grabbed and kissed a staffer's hand. *Id.* ¶¶ 70, 74. The defendants do not point to any evidence suggesting that Hsieh's concerns were unreasonable or not held in good faith.[3] To the contrary, Chin testified that, as she understood it, Hsieh did believe he was reporting episodes of harassment and discrimination, ECF 46-2, at 81:6-16, and Hsieh avers that he "believed and continue[s] to believe fully and in good faith, that the matters of which [he] complained . . . were in violation of the laws against discrimination and harassment in the workplace," ECF 47-2, ¶ 2. Thus, a reasonable factfinder could determine that Hsieh engaged in protected conduct because he reasonably believed that he was reporting instances of unlawful discrimination and harassment to his superiors.

B.   Causation.

To make out the third element of his *prima facie* case, Hsieh must set forth evidence connecting his complaints of discrimination and harassment at AACA to his suspension and subsequent termination. *See López-Hernández*, 64 F.4th at 31; *Verdrager*, 474 Mass. at 406. "[T]emporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (quoting *Mariani-Colón v. Dep't of Homeland Sec. ex. rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007)); *see Kinzer*,

---

[3] Citing no precedent, the defendants argue that because Hsieh allegedly engaged in workplace misconduct himself, he could not have reasonably and in good faith believed that other employees at AACA engaged in harassment or discrimination. ECF 45, at 9. Hsieh responds, and the Court agrees, that this theory would unduly diminish Title VII and Chapter 151B's protection against workplace retaliation.

99 F.4th at 117 (finding the timing of the plaintiff's termination alone to be sufficient to satisfy the plaintiff's burden of demonstrating causation).

The defendants contend that Hsieh cannot establish a causal connection between his complaints and his suspension and ultimate termination. They argue that Hsieh engaged in misconduct—separate and unrelated to his complaints—that served as the basis for his suspension and termination. In particular, they point to Hsieh's insubordination and refusal to cooperate with Chin, as well as Hsieh's conversations with Lin, a subordinate employee, in which he used sexual innuendos and discussed his dating history. Such evidence, the defendants contend, undermines any inference that Hsieh's complaints of discrimination and harassment were causally related to his termination.

Although this evidence bears on causation, Hsieh's evidence creates a dispute of material fact that forecloses summary judgment. Hsieh avers that Chin spent the "bulk" of the two-hour meeting on August 9, 2021—during which Chin informed him he had been placed on paid leave—"saying that [he] should not have described discrimination or harassment to AACA Board members." ECF 47-2, ¶ 5; *see* ECF 46-3, at 113:3-6. He also testified that Chin tried to convince him that his complaints did not involve actual discrimination or harassment. ECF 46-3, at 120:2-5. Hsieh further avers that, in the August 24, 2021 meeting, Dr. Salem and Chin conditioned his return to employment at AACA on his agreement to sign a document stating, falsely, that he "had not witnessed any sexual harassment or racial discrimination, that [he] had not reported any sexual harassment or racial discrimination, and that [he] was mistaken in any reports regarding [those] matters." ECF 47-2, ¶¶ 8, 10. And he further avers that, when discussing Hsieh's complaints during the meeting, Chin became "angry" and said, among other things: "'That's it? That's all you have to complain about me? That some guys are getting away with racism and sexism?'" *Id.* ¶ 11.

Following this meeting, Hsieh avers, his attorney informed AACA that it was retaliating against him, and shortly thereafter, his employment was terminated. *Id.* ¶¶ 13-14. This evidence amply demonstrates—on summary judgment, where Hsieh's burden is "relatively light"—an adequate causal connection between Hsieh's complaints of discrimination and harassment, on the one hand, and the defendants' decision to place him on paid leave and later terminate him, on the other. *DeCaire*, 530 F.3d at 19 (citation and quotation marks omitted). Hsieh has therefore satisfied the final element of his *prima facie* case.

## II.    Defendants' Non-Retaliatory Justification.

Since Hsieh has made out his *prima facie* case, "the burden shifts to [the defendants] to articulate a nonretaliatory explanation" for Hsieh's suspension and termination. *Kinzer*, 99 F.4th at 117; *see Verdrager*, 474 Mass. at 407-08. The defendants have introduced evidence that Hsieh was "terminated due to his erratic behavior, disruptive conduct, and overall poor performance," his "refus[al] to cooperate and work with other employees on annual events," his "engage[ment] in insubordination by refusing to take instruction from his supervisor," and his "sen[ding] disrespectful and threatening emails to [Chin] and other AACA colleagues and/or subordinates." ECF 46-4, at 3 (Interrog. Resp. 3); ECF 47, ¶ 14 (Hsieh not disputing the substance of AACA's interrogatory response). Poor performance, insubordination, unbecoming or inappropriate conduct, and threatening remarks are legitimate, nonretaliatory reasons for taking an adverse employment action against an employee. *See Pearson v. Massachusetts Bay Transp. Auth.*, 723 F.3d 36, 41 (1st Cir. 2013) (insubordination); *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 32 (1st Cir. 2015) (threatening remarks and inappropriate conduct); *Bosah v. City of Bos.*, No. 17-P-862, 2019 WL 3763634, at *9 (Mass. App. Ct. Aug. 9, 2019) (Rule 1:28 decision) (poor

performance, insubordination, unbecoming conduct). The defendants have, accordingly, carried their burden of production.

### III. Pretext.

Finally, the burden returns to Hsieh to "'point to specific facts that would demonstrate' to a reasonable jury that [the defendants'] invocation" of Hsieh's insubordination and threatening conduct was a "'sham or pretext intended to cover up [the defendants'] retaliatory motive.'" *Kinzer*, 99 F.4th at 118 (quoting *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 26 (1st Cir. 2004)); *see Verdrager*, 474 F.3d at 406. There is "no mechanical formula for assessing whether an employee has established pretext." *Kinzer*, 99 F.4th at 118 (citation and quotation marks omitted). Although "mere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext," *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012), "[a] plaintiff may establish pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's offered reasons for the termination that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non[retaliatory] reasons," *Lahens*, 28 F.4th at 335 (quotation marks omitted). "The combination of a 'prima facie case' of retaliation with 'a showing of pretext' allows a jury to infer that there was no 'legitimate explanation for the adverse [employment] decision' and that the employer's true motivation was retaliatory." *Verdrager*, 474 Mass. at 406 (quoting *Blare v. Husky Injection Molding Sys. Bos., Inc.*, 419 Mass. 437, 446 (1995)).

Relying on the same evidence invoked for the causation element of his *prima facie* case, Hsieh argues that a reasonable jury could find the defendants' proffered non-retaliatory justifications to be pretextual. He emphasizes that Chin, repeatedly, and Dr. Salem, at least on one

19

occasion, pressured him to retract his complaints of discrimination and harassment and attempted to convince him that the conduct underlying his complaints did not amount to discrimination or harassment. *See* ECF 47-2, ¶¶ 5, 8, 10, 11. Further, Hsieh's affidavit states that Dr. Salem and Chin conditioned his return to work on Hsieh's signing a document attesting, incorrectly, that he had not witnessed or reported any discrimination or harassment and that any reports regarding such matters were mistaken. *See id.* ¶¶ 8, 10. This evidence creates a genuine dispute of material fact as to whether, as the defendants contend, Hsieh was suspended and terminated for poor performance, insubordination, inappropriate conduct, and threatening remarks, or whether, as Hsieh argues, those reasons are pretextual and he was suspended and terminated because of his complaints of discrimination and harassment. On this record, a reasonable jury could, but need not, conclude that Hsieh was suspended and then fired because of his protected conduct. Hsieh has thus satisfied his burden, and the defendants are not entitled to summary judgment on his claims of retaliation.

## CONCLUSION AND ORDER

For the foregoing reasons, the defendants' motion for summary judgment is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: February 24, 2025